IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| ALLIED CENTER FOR SPECIAL SURGERY, AUSTIN, LLC; ALLIED CENTER FOR SPECIAL SURGERY, DFW, LLC; ALLIED CENTER FOR SPECIAL SURGERY, SAN ANTONIO, LLC; ALLIED CENTER FOR SPECIAL SURGERY, LAS VEGAS, LLC; ALLIED CENTER FOR SPECIAL SURGERY, SCOTTSDALE, LLC; BARRETT FOOT AND ANKLE CENTERS, PHOENIX L.L.C.; and ALLIED ORTHOPEDICS & HAND, PHOENIX, L.L.C. <br><br> Plaintiffs, <br><br> vs. <br><br> AETNA HEALTH INC. and AETNA LIFE INSURANCE COMPANY, <br><br> Defendants. | § § § § § § § § § § § § § § § § § § § § § § § § | CIVIL ACTION NO. 4:15-cv-2752 |

**PLAINTIFFS' FIRST AMENDED COMPLAINT**

COMES NOW ALLIED CENTER FOR SPECIAL SURGERY, AUSTIN, L.L.C.; ALLIED CENTER FOR SPECIAL SURGERY, DFW, L.L.C.; ALLIED CENTER FOR SPECIAL SURGERY, SAN ANTONIO, L.L.C.; ALLIED CENTER FOR SPECIAL SURGERY, LAS VEGAS, L.L.C., ALLIED CENTER FOR SPECIAL SURGERY, SCOTTSDALE, L.L.C., BARRETT FOOT AND ANKLE CENTERS, PHOENIX L.L.C., and ALLIED ORTHOPEDICS & HAND PHOENIX, L.L.C. ("Plaintiffs" or "Allied"), complaining of AETNA HEALTH, INC. and AETNA LIFE INSURANCE COMPANY ("Defendants" or "Aetna"), and for cause of action would show the following:

EXHIBIT A

1

## I. PARTIES

1. Plaintiff, Allied Center for Special Surgery, Austin L.L.C. is a Texas limited liability company and maintained its principal place of business in Houston, Harris County, Texas.

2. Plaintiff, Allied Center for Special Surgery, DFW L.L.C. is a Texas limited liability company and maintained its principal place of business in Houston, Harris County, Texas.

3. Plaintiff, Allied Center for Special Surgery, San Antonio L.L.C. is a Texas limited liability company and maintained its principal place of business in Houston, Harris County, Texas.

4. Plaintiff, Allied Center for Special Surgery, Las Vegas L.L.C. is a Texas limited liability company and maintained its principal place of business in Las Vegas, Nevada.

5. Plaintiff, Allied Center for Special Surgery, Scottsdale L.L.C. is a Texas limited liability company and maintained its principal place of business in Scottsdale, Arizona.

6. Plaintiff, Barrett Foot and Ankle Centers, Phoenix L.L.C., is an Arizona limited liability company and maintained its principal place of business in Phoenix, Arizona.

7. Plaintiff Allied Orthopedics & Hand, Phoenix, L.L.C., is an Arizona limited liability company and maintained its principal place of business in Phoenix, Arizona.

8. Defendant, Aetna Health Inc., is a nonresident company doing business in the state of Texas. A copy of Plaintiffs' First Amended Complaint will be provided to Defendants' attorneys of record at time of filing.

9. Defendant, Aetna Life Insurance Company is a nonresident insurance company doing business in the State of Texas. A copy of Plaintiffs' First Amended Complaint will be provided to Defendants' attorneys of record at time of filing.

## II. AGENCY

10. Any time it is alleged in this action that Aetna did an act or failed to do any act or thing, it is meant that Aetna's authorized, apparent or ostensible agents, employees or representatives did such act or failed to do such act or thing, thereby making Aetna liable.

## III. CLAIMS FOR RELIEF

11. This is a suit concerning the recovery of payment for medical care, treatment, and services provided by Plaintiffs to insured members of Aetna. Specifically, this suit involves underpayments and/or denials of reimbursement for Plaintiffs' medical bills submitted to Aetna after having provided medically necessary care and treatment. At all times, Plaintiffs were "out-of-network" providers, i.e., they did not have a managed care agreement with Aetna that prescribed reimbursement levels for services provided. Rather, fee reimbursement for Plaintiffs was determined solely by Aetna's own methodology. In each case, Plaintiffs provided medically necessary treatment to Aetna's members. However, Aetna continually denied and/or underpaid Plaintiffs' claims made the subject of this suit. Plaintiffs are alleging negligence and negligent misrepresentation; violations of Texas statutory law; promissory estoppel; and violations of the Employee Retirement Income Security Act of 1974 ("ERISA").

12. Plaintiffs seek monetary relief of over one million dollars ($1,000,000.00), an amount which is within the jurisdictional limits of this Court, and for all other relief, general or special, legal or equitable, to which they are entitled.

## IV. CONDITIONS PRECEDENT

13. Plaintiffs would show that all conditions precedent to their right to claim and recover the relief prayed for herein have been exhausted and/or are futile.

## V. FACTUAL BACKGROUND

### A. Overview of Health Care Industry in Texas

14. It is common practice and customary in the health care industry (the "Industry") for health insurance companies, health plans, health maintenance organizations ("HMOs"), and preferred provider organizations ("PPOs") (i.e., all of which throughout the Industry are collectively and commonly referred to as "Payors") to issue wallet-sized cards to the individuals who are insured/covered under health insurance policies and health plans, which have printed pertinent contact information ("insurance cards"), so that those covered individuals can, when they are seeking health care from medical providers, show those insurance cards to the providers from whom they are seeking treatment. The providers in turn can use the information and telephone numbers printed on the insurance cards to contact the insurance companies and/or health plans:

1) To confirm that a specific individual is currently still covered under a given health insurance policy/health plan;

2) To discover specifically what benefits and level of benefits are available under the individuals' health insurance policy/health plan to reimburse the medical provider considered providing hospital goods and services to a particular individual/patient;

3) To discover where the medical provider should submit its claim for caring for the patient, if the provider subsequently makes the financial decision to accept that particular level of benefits (i.e., payment amount) and provide the proposed care and treatment to that particular individual.

In this respect, it is widely recognized and well known throughout the Industry that, other than by placing the telephone calls described above, providers have no other reasonable means of learning/becoming aware of the benefits and level of benefits which a particular patient may be entitled to have paid to a hospital for any given treatment, under any particular person's health plan or policy of insurance. Consequently, it is widely recognized and well known throughout the Industry that providers need to be able to efficiently contact the health insurance companies/health

4

plans in question or their third party administrators (i.e., agents of the health insurance companies/health plans) so that:

1) Insurance companies/health plans can provide this type of accurate and important information to the providers; and

2) The providers can, in turn, use that information to make their important financial decisions about whether to admit and provide the care in question for a given patient.

Individuals with such health coverage are often referred to in the Industry as "insured members" or "covered individuals;" and the wallet-sized cards which insurance companies and health plans routinely issue to covered individuals are often referred to in the Industry as "insurance cards." Furthermore, the telephone calls which hospitals routinely place to the insurance companies and health plans—to learn the benefits and levels of benefits available under the policies/health plans—are often referred to in the Industry as "insurance verification calls" or simply "verifications."

15.    For the reasons described above, it is a customary practice in the Industry for providers, when prospective patients present at providers for admission and care, to routinely ask to see the prospective patients' insurance cards; and it is also a common and customary practice in the Industry for the providers to then use the telephone numbers and other pertinent information appearing on the insurance cards to place insurance verification calls to the insurance companies/health plans and/or third party administrators, where applicable, so that those providers can obtain accurate and timely information from the insurance companies and health plans and/or third party administrators. In turn, the providers routinely use insurance verification calls to (i) confirm if a specific prospective patient is currently still a covered individual under a given health insurance policy or health plan; (ii) discover, specifically, what benefits and the level of benefits (i.e., amount of benefits) are available under a specific covered individual's health insurance policy/health plan (i.e., which will be paid to the provider considering providing care and treatment

to a specific covered individual); and (iii) to discover where the provider should submit its claim for reimbursement, for providing health care goods and services to the covered individual if the provider makes the financial decision to accept that particular level of benefits and provide health care goods and services to the covered individual in question. The provider's decision to provide care and treatment, then, is based in significant part on the benefit amount/benefit level information provided to it by the insurance companies/health plans during the insurance verification calls.

16.  The above-described commercial realities of the Industry are *so* widely recognized and well known throughout the Industry, and the above-described customs and routine practices are *so* widely followed throughout the Industry, that Texas courts have for decades taken notice of these commercial realities, customs, and routine practices—including the fact that providers must be able to rely upon the truthfulness and completeness of the information the providers are given by insurance companies during insurance verification phone calls. *See Hermann Hospital v. Nat'l Standard Ins.*, 776 S.W.2d 249, 254 (Tex. App.—Houston [1st Dist.] 1989, no writ) (holding that providers can sue and recover for damages proximately caused by insurance companies' misrepresentations about the health coverage and benefits available to providers for their treatment of patients).[1]

---

[1] In *Hermann*, the First Court of Appeals took notice of these truisms and held:

> Hermann Hospital is not suing on an insurance policy or for the wrongful denial of payment under Romano's worker's compensation insurance policy. It is suing for the damages it suffered by relying on the representations of coverage allegedly made by appellees. The Supreme Court has held that misrepresentations as to coverage and benefits are precisely the sort of conduct that give rise to a cause of action under this section. *Aetna Casualty & Surety Co. v. Marshall*, 724 S.W.2d 770, 772 (Tex. 1987). We find that as a practical matter, the relationship between insurance companies and providers of health care is a direct one, **with the health care provider acting in reliance on the representations of coverage made by the carriers. Hospitals and other health care providers must, and do, rely upon the insurance carriers' representations of coverage in making their decisions regarding admissions of potential patients. If insurance coverage**

### B. Plaintiffs' Claims Against Aetna

17. Aetna's preferred provider health insurance plans generally provide a higher level of benefits to consumers who receive health care services from facilities contracted with Aetna either as "preferred" or "participating" facilities. Under the terms of most Aetna plans, if consumers receive services from non-contracted facilities, consumers not only generally receive a lower percentage level of benefits, but Aetna also pays the facilities based upon an "allowed" amount which is not defined in any insurance plans administered or insured by Aetna and not disclosed to non-contracted facilities.

18. Aetna has set its "allowable" amounts for non-contracted facilities at unreasonably low rates that are far less than the amounts billed by the facilities and also far less than the rates paid to Aetna contracted facilities.

19. On or about 2006, Plaintiffs provided medical services and treatment, of which many of the patients were insured with Defendants. Because the Plaintiffs were not a "preferred" or "participating" facility with the Defendants, any and all medical services and treatment provided to Aetna members would be considered out of network.

---

**and benefits can be verified, the hospital will usually accept an assignment of benefits to ensure it is paid for any services rendered. If insurance coverage and benefits cannot be verified, or if no coverage exists, the medical provider can then make alternative financial arrangements. To insulate the insurance carriers from liability leaves the medical care provider without recourse against the party causing its damage, if it acts in reliance on the representation of coverage.** Had the insurance carrier not falsely or negligently provided information, appellant could have sought alternative means to ensure that it received payment for services before rendering them.

*Hermann*, 776 S.W.2d at 254 (emphasis added).

20. Attached as Exhibit A[2] is a comprehensive list of the medical care and treatment Plaintiffs provided to Aetna members. On or before the date of services being rendered, Plaintiffs contacted Aetna and obtained verification of insurance and received preauthorization for all treatment to be provided to the Aetna members at issue in this suit. The representations made to Plaintiffs' employees were through an express, implied, ostensible, or other authorized agent or representative of Aetna. Plaintiffs treated all patients identified on Exhibit A as patients covered by Aetna within 30 days of the date of verification, and provided the medically necessary care and treatment commensurate with their medical conditions.

21. Plaintiffs timely submitted clean claims to Aetna for payment of their medical bills, which included their usual and customary billed charges for the medical services and supplies provided to the patients identified on Exhibit A.

22. After Plaintiffs submitted its clean claims to Aetna, Aetna paid the claims based upon its "allowed" amount which was not disclosed at the time of verification. In fact, the "allowed" amount by Aetna was typically thirty percent (30%) of Plaintiffs' billed charges.

23. Plaintiffs rendered the medically necessary services, the same being the reasonable and customary charges for like items and services in the respective counties where the services were performed. Plaintiff's damages are at least $30,000.00.00, with interest thereon at the highest legal rate.

### VI. COUNT ONE: Negligence and Negligent Misrepresentation

24. Plaintiffs re-allege the paragraphs above and incorporate the same herein by reference as if fully set forth here verbatim.

---

[2] Exhibit A will be produced under separate cover to the Defendants' attorney of record and is not filed with the Court.

25. Plaintiffs would show that it is a business custom in the health care and insurance industries for health care providers to call insurance companies or their agents to verify/pre-certify insurance coverage, eligibility, and payment benefit levels for patients being treated. Insurance companies and their agents owe duties to health care providers to reasonably and adequately investigate the existence of insurance coverage and payment benefit levels, and to convey accurate information to the health care provider.

26. Health care providers are without the knowledge or means to gain such knowledge concerning insurance coverage and payment benefit levels, and must rely upon the representations of insurance companies or their agents in determining the method and means of being reimbursed for the medical services extended to the patient/insured. Once insurance coverage is "verified" and "authorized" by an agent or representative of an insurance company or third party administrator, the insurance company cannot disclaim liability or deny the claim pursuant to the provisions of 28 Texas Administrative Code §§ 19.1703, 19.1718, and 19.1719. A healthcare provider must therefore be able to rely upon the insurer's conveyance of accurate, complete, and current eligibility status of their insureds, the benefit payment levels available to cover the patient, and the authorization for services.

27. There are at least 1300 claims made the basis of this action. The specific representations made by Aetna concerning benefits, eligibility, preauthorization, and expectations of reimbursement are contained in Plaintiffs' business records. As an example of an actual claim in this suit, an Aetna member requested medical services performed at one of Plaintiffs' facilities. Prior to the member's admit, Plaintiffs contacted Aetna and specifically requested from Aetna eligibility and verification of insurance benefits. Aetna represented to Plaintiffs the member had active insurance coverage with an effective date of coverage, represented the member's co-pay

9

and/or deductible amount due, the maximum out-of-pocket amount due, then represented to Plaintiffs the expected reimbursement amount would be 60% of the usual and customary billed charge with the remaining 40% of the customary billed charge owed by the member. The representations made by Aetna concerning the member's co-pay, deductible, out-of-pocket benefit amounts, and expected payment amount are conveyed to the member. In this example, Plaintiffs represented to the member the co-pay/deductible amount due was $974.51, a $3,000 out-of-pocket maximum amount due, in addition to a 40% patient responsibility amount due after payment is received by Plaintiffs from Aetna. Plaintiff's usual and customary billed charge was $54,384.00 and the expected reimbursement was 60% of the usual and customary billed charge, minus any patient responsibility amount of co-pay/deductible, out-of-pocket maximum amount, and 40% patient responsibility amount. Aetna "allowed" $3,304.30 of which $1,321.72 was patient responsibility and issued a payment to Plaintiffs for $1,982.58 and denied any additional payment to Plaintiffs on the basis that the payment was made according to allowable expenses for the member's plan. None of this information was represented by Aetna at the time of verification of insurance benefits provided by Aetna to Plaintiffs.

28. The above referenced information contained in Plaintiffs' business record is but a sampling of the representations made by Aetna to Plaintiffs concerning the claims at issue in this suit. The representations are emblematic of the nature of the claims as a whole, and further specifically depict the nature of the representations Aetna made to Plaintiffs.

29. The specific representations made by Aetna were made to Plaintiffs in response to Plaintiffs' specific inquiries on eligibility, coverage, benefit levels, and expected reimbursement of the medical services and treatment provided to Aetna patients identified on Exhibit A. Plaintiffs informed Aetna it was obtaining this information with respect to treating these patients at their

facilities. Plaintiffs relied on the representations provided by Aetna. It was foreseeable that Plaintiffs would rely upon the representations and verifications of Aetna. Plaintiffs did justifiably detrimentally rely on Aetna's verifications and representations concerning eligibility, coverage, benefit levels, and had the reasonable expectation of being paid fairly for the valuable services and supplies extended to Aetna's insureds in good faith.

30. Aetna breached duties owed to Plaintiffs as set-forth above, as Aetna failed to exercise reasonable care and competence in conveying true and accurate information concerning eligibility, benefits and coverage for these patients, and in failing to honor their verification and certification of services under the statutes cited above and at common law.

31. Plaintiffs will show that they have been damaged as a result of Defendants' negligence and negligent misrepresentations. As a proximate cause of said misrepresentations, Plaintiffs have been damaged in the total amount of at least $30,000,000.00 including interest thereon at the highest legal rate.

## VII. COUNT TWO: Statutory Violations

32. Plaintiffs re-allege the paragraphs above and incorporate the same herein by reference as if fully set forth here verbatim.

33. Plaintiffs allege the following statutory violations based on violations of the Texas Administrative and Business and Commerce Codes. These violations are brought on behalf of only the Texas facilities and are not alleged by any out-of-state facilities made a party to this Petition.

34. Plaintiffs bring this action as they have been injured by Aetna and its agents' acts done in violation of 28 Texas Administrative Code § 19.1719; Texas Insurance Code § 541.051, 541.052, and 541.056; and Texas Business and Commerce Code, § 17.46, titled "Deceptive Trade

Practices Unlawful" (or as applicable, recodification by amendment) which the Texas Insurance Code adopts and includes as violations under the Texas Insurance Code.

35. Plaintiffs' causes of action arise out of the following violations of the Texas Administrative Code:

A. 28 Texas Administrative Code § 19.1719, by failing to pay claims where Aetna verified and preauthorized its HMO/PPO members' eligibility and coverage, and the services were rendered by Plaintiffs within thirty (30) days.

B. Texas Insurance Code, § 541.051 as follows:

(1) make, issue, or circulate or cause to be made, issued, or circulated, an estimate, illustration, circular or statement misrepresenting with respect to a policy issued or to be issued the terms of the policy, benefits or advantages promised by the policy;

C. Texas Insurance Code, § 541.056 as follows:

(a) Make, publish, disseminate, circulate, or place before the public or directly or indirectly cause to be made, published, disseminated, circulated, or placed before the public an advertisement, announcement, or statement containing an untrue, deceptive, or misleading assertion, representation, or statement regarding the business of insurance or a person in the conduct of the person's insurance business;

D. Texas Insurance Code, § 541.056 as follows:

(A) Knowingly permit the making of ... an agreement regarding the contract, other than as plainly expressed in the issued contract ...

E. The following practices defined by Texas Business and Commerce Code, § 17.46 as unlawful and the entitlement to relief for which is set forth in Chapter 542 et seq. of the Texas Insurance Code:

(1) "causing confusion or misunderstanding as to the source, sponsorship, approval, or certification of goods or services," § 17.46(b)(2);

(2) representing that goods or services have sponsorship, approval, characteristics, ingredients, uses, benefits, or quantities which they do not have or that a

person has a sponsorship, approval, status, affiliation, or connection which he does not, § 17.46(5);

(3) representing that goods or services are of a particular standard, quality or grade, or that goods are of a particular style or model, if they are of another, § 17.46(b)(7);

(4) representing that an agreement confers or involves rights, remedies, or obligations which it does not have or involve, or which are prohibited by law, § 17.46(b)(12).

36. Plaintiffs would show that as the unlawful conduct of Aetna was committed "knowingly," Plaintiffs are entitled to three (3) times the actual damages as provided under Texas Insurance Code § 541.152, plus reasonable and necessary attorney's fees and costs of suit, all for which amount it hereby seeks relief.

## VIII. COUNT THREE: Promissory Estoppel

37. Plaintiffs re-allege the paragraphs above and incorporate the same herein by reference as if fully set forth here verbatim.

38. Plaintiffs plead for the recovery of additional reimbursement under the doctrine of promissory estoppel. Aetna made a promise to Plaintiffs to pay a reasonable and fair amount for the medical care and treatment provided to its members. Based upon Aetna's promise to Plaintiffs, it was foreseeable by Aetna that Plaintiffs would rely on the promise to receive a reasonable and fair amount of reimbursement, and Plaintiffs substantially relied on the promise of fair and reasonable reimbursement to its detriment. Aetna's failure to abide by its promises has damaged Plaintiffs, in an amount in excess of the jurisdictional limits of this Court.

## IX. COUNT FOUR: Claim for Plan Benefits Pursuant to ERISA § 502(a)(1)(B)

39. Plaintiffs adopt by reference and incorporate herein the preceding factual allegations as if fully set forth verbatim.

40. Plaintiffs, as assignees of the Aetna members and beneficiaries, properly submitted its claims for payment to Aetna. The medical expenses incurred by the Patients at issue (the Plans' members) were covered under employee benefit plans administered by Aetna. The Defendants have improperly determined the reimbursement of Plaintiffs' claims for benefits in violation of the regulations promulgated under ERISA. Furthermore, Aetna has failed to justify or otherwise fully explain how the claims were paid or that an adverse benefit determination was made.

41. Plaintiffs have made demands upon Aetna for additional payment or reimbursement of the incurred medical expenses as provided for under the employee benefit plans at issue. Plaintiffs have exhausted its administrative remedies to the best of its abilities.

42. Aetna's refusal to pay Plaintiffs pursuant to the employee benefit plans constitutes a violation of ERISA §502(a)(1)(B), 29 U.S.C. §1132(a)(1)(B). Under the pertinent Plan documents and ERISA, Plaintiffs are entitled to additional reimbursement for the covered expenses incurred by the Patients, as assignees of the members under the employee benefit plans administered by Aetna. Pursuant to ERISA §502(a)(1)(B), 29 U.S.C. §1132(a)(1)(B), Plaintiffs hereby seeks appropriate relief for continuing violations under ERISA.

## X. RIGHT TO AMEND

43. Plaintiffs believe they may have claims for benefits under ERISA, as well as state law claims for negligent misrepresentation, violations of the Texas Administrative Code, and/or promissory estoppel. However, Plaintiffs specifically reserve the right to amend these pleadings until sometime after copies of the applicable master plans, summary plan descriptions, fee schedules, administrative records, and any related explanations/calculations for the rates paid on the claims at issue, are produced by Aetna, or pursuant to pre-trial discovery, or upon order of the court, or as counsel may agree.

## XI. DEMAND FOR TRIAL BY JURY

44.     Plaintiffs demand a trial by jury on all issues of fact for its non-ERISA claims.

## XII. ATTORNEY'S FEES

45.     Plaintiffs will show that it was necessary for it to retain the services of Sassi Law Firm, P.C., a law firm with attorneys licensed to practice law in the State of Texas, to prepare and prosecute this cause of action. Plaintiffs will further show that they have agreed to pay them a reasonable fee for their services rendered, including preparation, trial, and all levels of appeal, for which it hereby seeks relief. Plaintiffs thereby seek attorney's fees for its causes of action detailed above and their ERISA claims pursuant to 29 U.S.C. § 1132(g).

## PRAYER FOR RELIEF

WHEREFORE, PREMISES CONSIDERED, Plaintiffs request that Defendants Aetna be cited to appear and answer, and that on final trial, Plaintiff have judgment against Defendants, jointly and severally, for the following:

(a)     Plaintiff's actual damages of at least $30,000,000.00;

(b)     Prejudgment interest at the highest legal rate;

(c)     Treble damages and/or punitive damages in the highest amount allowed by law;

(d)     Reasonable attorney's fees through trial and all levels of appeal;

(e)     All fees and costs of Court expended in pursuit of this action;

(f)     Post judgment interest at the highest legal rate; and

(g)     Such other and further relief, general or special, legal or equitable, to which Plaintiffs are justly entitled.

Respectfully submitted,

By: *Lynne Sassi*
LYNNE SASSI
State Bar No. 24041868
Email: lsassi@sassilawfirmpc.com

**ATTORNEY-IN-CHARGE FOR PLAINTIFFS**

OF COUNSEL:

CHRISTOPHER SASSI
State Bar No. 24093107
SASSI LAW FIRM, P.C.
2537 S. Gessner, Suite 246
Houston, TX 77063
Telephone: (713) 360-7274
Facsimile: (713) 360-7260
Email: csassi@sassilawfirmpc.com